UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
DALE DERR,                       :
                                 :CIVIL ACTION NO. 3:16-CV-197
          Plaintiff,             :
                                 :(JUDGE CONABOY)
          v.                     :
                                 :
CAROLYN W. COLVIN,               :
Acting Commissioner of           :
Social Security,                 :
                                 :
          Defendant.             :
                                 :
```

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Social Security Income ("SSI") under Title XVI. (Doc. 1.)  He alleged disability beginning on August 22, 2013. (R. 10.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Randy Riley, concluded in his February 3, 2015, decision that Plaintiff's severe impairments of History of Coronary Artery Disease, Lower Extremity Cellulitis, Obesity, and Hearing Loss did not alone or in combination meet or equal the listings. (R. 12-13.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy. (R. 13-18.)   ALJ Riley therefore found Plaintiff was not disabled. (R. 18.)

With this action, Plaintiff asserts that the Acting

Commissioner's decision should be reversed or remanded for the following reasons: 1) substantial evidence does not support the ALJ's evaluation of the opinion evidence; 2) substantial evidence does not support the ALJ's RFC assessment; and 3) substantial evidence does not support the ALJ's credibility assessment.  (Doc. 9 at 1-2.)  After careful review of the record and the parties' filings, I conclude this appeal is properly denied.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB and SSI on November 18, 2013.  (R. 10.)  The claims were initially denied on March 17, 2014, and Plaintiff filed a request for a hearing before an ALJ on March 28, 2014.  (*Id.*)

ALJ Riley held a hearing on December 16, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Michael Kibler.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on February 3, 2015, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 18.)

Plaintiff's request for review of the ALJ's decision was dated February 3, 2015.  (R. 1.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on December 7, 2015.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On February 5, 2016, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on April 4, 2016.  (Docs. 7, 8.)  Plaintiff filed his supporting brief on May 17, 2016.  (Doc. 9.)  Defendant filed her brief on June 10, 2016.  (Doc. 10.)  Plaintiff filed a reply brief on June 19, 2016.  (Doc. 11.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on May 16, 1965, and was forty-eight years old on the alleged disability onset date.  (R. 17.)  Plaintiff completed high school and had past relevant work as an auto mechanic and construction worker.  (*Id.*)

**1.   Impairment Evidence**

The following factual recitation is partially derived from the Summary of Impairments in Plaintiff's brief.[1]  (Doc. 9 at 3-7.) The Summary is supplemented with additional facts relevant to the parties' arguments.

> On March 12, 2012, Derr presented to Lebanon Cardiology for a follow up of his CAD.  (Tr. 265).  It was reported that Derr was 66 inches tall, weighed 232 pounds and had a BMI of 37.4.  Andrew P. Chodos, MD diagnosed coronary atherosclerosis native,

---

[1]   The Court adopts portions of the Summary of Impairments in that Defendant does not dispute the objective medical facts set out by Plaintiff.  (Doc. 10 at 2.)

3

percutaneous coronary angioplasty post surgical status, hyperlipidemia mixed and peripheral vascular disease unspecified (claudication).  (Tr. 266).

During a follow up visit on September 14, 2012, it was noted that Derr weighed 225 pounds and had a BMI of 35.2.  (Tr. 271). Dr. Chodos assessed that Derr's weight loss efforts were unsuccessful.  (Tr. 272).

On November 10, 2012, Derr was seen at the emergency department at Good Samaritan Hospital with complaints of right leg pain with redness and swelling.  (Tr. 334).  The examining physician diagnosed cellulitis, acute.  (Tr. 335).

On November 13, 2012, Derr was seen at Myerstown Family Practice for evaluation of CAD and right leg swelling and redness.  (Tr. 351).  It was reported that Derr weighed 220.4 pounds. (Tr. 351).  Treating physician T. Wangdi Sherpa, MD observed right lower extremity significant edema and redness. (Tr. 351).  Dr. Sherpa diagnosed cellulitis and abscess unspecified site: edema: hypothyroidism other unspecified: coronary atherosclerosis and hyperlipidemia mixed. (Tr. 352).

During a follow up visit on February 5, 2013, Dr. Sherpa noted that Derr weighed 229.4 pounds and had a BMI of 36.4.  (Tr. 361).[2]

On August 6, 2013, Dr. Sherpa observed right lower extremity edema and cellulitis. (Tr. 367).

_____

[2]  At this visit, Plaintiff reported that he was overall doing well since his last visit and his intermittent swelling in the leg was "not bad at all."  (R. 361.)   Examination of the skin showed significant edema and redness consistent with cellulitis.  (*Id.*) Regarding edema, Dr. Sherpa assessed that Plaintiff was "now doing well and advised to continue with lasix and potassium."  (R. 362.)

On August 25, 2013, Derr presented to the emergency department at the Good Samaritan Hospital with complaints of left lower extremity swelling and redness. (Tr. 303). Derr underwent a venous duplex lower extremity-left on August 25, 2013 which showed inguinal lymphadenopathy. (Tr. 282). A CT left lower extremity with contrast dated August 28, 2013 demonstrated moderate to severe, diffuse left lower extremity superficial cellulitis without abscess, necrotizing fasciitis, myositis, or osteomyelitis. (Tr. 283). Derr was discharged on September 3, 2013 with a diagnosis of left lower extremity cellulitis, history of coronary artery disease with stents and hypothyroidism. (Tr. 302).[3]

On September 12, 2013, Derr presented to Myerstown Family Practice for a follow up on his left lower extremity cellulitis and edema. (Tr. 372). Dr. Sherpa noted that he weighted 212 pounds and had a BMI of 33.7. (Tr. 372). Dr. Sherpa observed that his left lower extremity had a significant wound and some abscess with necrosis and diagnosed left lower extremity cellulitis. (Tr. 372).

On September 18, 2013, Derr was again seen at the Good Samaritan Hospital with complaints of residual ulceration and draining. (Tr. 297). The examining

---

[3] In the September 3, 2013, Discharge Summary, Joseph T. Acri, M.D., noted

[t]he patient is to be off work for another two weeks until he is completed with his antibiotics and the leg feels well enough without any further swelling or complications from this infection. I am fearful of a post phlebitic syndrome with him; therefore, he has to utilize good support stockings once the infection and the swelling are significantly improved.

(R. 303.)

5

> physician diagnosed resolving cellulitis,
> status post abscess recommended arterial and
> venous Doppler to check for peripheral
> arterial disease and venous insufficiency.
> (Tr. 298).
>
> On October 7, 2013, it was noted that he
> weighed 218 pounds and had a BMI of 34.7.
> (Tr. 277).  Dr. Chodos noted that Derr was
> 4.5 years out from bare-metal stenting.  (Tr.
> 277).  He also noted that Derr missed his
> previous follow-up as well as stress test due
> to financial issues.  (Tr. 277).  Dr. Chodos
> decided to call for discharge summary and
> vascular studies.  (Tr. 277).

(R. 3-5.)

On November 14, 2013, Stephen G. Roda, D.O., of the Good

Samaritan Hospital Wound Care Center sent discharge summary

correspondence to Dr. Sherpa.  (R. 289.)  Dr. Roda noted "on

presentation today, his wound is well-healed, well-granulated.

There is no periwound erythema.  There is no wound discharge.  He

has full range of motion."  (*Id.*)  Dr. Roda indicated that

Plaintiff could follow up with Dr. Sherpa as needed.  (*Id.*)  He set

out the following Plan:

> I would recommend . . . he use compression
> pumps at least daily to manage edema.  He
> should wear whatever compression hose he
> chooses.  He does have Juxta-Lites.  He also
> has a pair of Jobst stockings depending on
> how he can manage at work.  We do not have
> him on any persistent antibiotics or any
> other medicines.

(*Id.*)

On November 15, 2013, Dr. Sherpa noted that Plaintiff was

doing much better and was healing.  (R. 374.)  He added that

6

Plaintiff was not able to work due to his constant wound infections.  (*Id.*)

Records from the Lebanon VA Medical Center dated June 25, 2014, indicate that Plaintiff was seen for the first time by Maryann T. Gushue, M.D.  (R. 451-54.)  She states in the Progress Notes that Plaintiff presented "to establish with the VA."  (R. 451.)  By history, Dr. Gushue recorded CAD s/p bare metal stent mid RCA: hypothyroidism; recurrent cellulitis bilateral lower extremities; skull fractures X 2; and seasonal allergies.  (*Id.*)  In the Review of Systems, Plaintiff reported he was due for an eye exam and he requested an audiology consultation because of hearing loss; he denied any other problems.  (R. 452.)  Plaintiff was sixty-seven inches, weighed 230.7 pounds, and had a BMI of 36. (*Id.*)  Physical examination showed no problems, including no edema in the extremities.  (R. 453.)  Dr. Gushue's Assessment was the same as the history except she added that Plaintiff had a history of tobacco use.  (*Id.*)

Robert J. Baker, Au.D., performed a complete hearing evaluation on October 8, 2014, based on Plaintiff's complaints of hearing loss and tinnitus.  (R. 439.)  Dr. Baker noted that Plaintiff had a history of significant hazardous noise exposure. (*Id.*)  He assessed that Plaintiff had mild to severe sensorineural hearing loss with poor speech understanding in the right ear and moderate high frequency (3k-8k Hz) sensorineural hearing loss with

excellent speech understanding in the left ear.  (R. 440.)

On November 4, 2014, Plaintiff was seen at the Lebanon VA Medical Center by Frank C. Wilson, a physician's assistant.  (R. 435-36.)  Mr. Wilson reported that Plaintiff presented for his regularly scheduled appointment and to have Social Security forms filled out.  (R. 435.)  He noted that he filled out the forms to the best of his ability and forwarded them to Plaintiff's primary care provider for signature.  (*Id.*)  Mr. Wilson recorded that Plaintiff "has chronic stasis ulcerations to the bilateral lower extremity.  They are well healed at this point, but he uses support hose and braces for his lower extremities.  He has chronic cellulitis and an absess on his lower limbs, and he has well-healed cellulitis scars on both lower extremities."  (*Id.*)  Mr. Wilson's Assessment was chronic cellulitis and abscesses of the lower limbs and coronary artery disease.  (*Id.*)  In his Plan, for the cellulitis he recorded only that papers were filled out for Social Security Disability for which Plaintiff was applying; and for the coronary artery disease and hypothyroidism he was to continue on his medications.  (*Id.*)  Plaintiff was to return in three months. (R. 436.)

## 2.   Opinion Evidence

On November 15, 2013, Dr. Sherpa noted at a follow up visit for cellulitis and edema that Plaintiff had been seen by Dr. Roda at the wound care center, and the significant wound on his left leg

8

was better and healing.  (R. 374.)  In his Assessment he noted "Pt
not able to work due to his constant wound infections."  (R. 374.)

On March 14, 2014, Robert J. Balogh, M.D., a State agency
medical consultant, reviewed Plaintiff's records and assessed
Plaintiff's functional abilities.  (R. 49-51, 57-59.)  He concluded
that Plaintiff had the severe impairments of Dermatitis, Chronic
Infections of Skin or Mucous Membranes, and Other Open Wounds,
Except Limbs.  (R. 49-57.)  Dr. Balogh indicated that the RFC
assessment was for twelve months after onset: August 21, 2014.  (R.
50, 58.)  He concluded that Plaintiff could lift and/or carry fifty
pounds occasionally and twenty-five pounds frequently; he could
stand and/or walk for about six hours in an eight-hour day and sit
for the same amount of time; and his ability to push and/or pull
was unlimited other than as shown for lift and/or carry.  (R. 50-
51, 58-59.)  Dr Balogh provided additional explanation for his
conclusions, including that Plaintiff "had a specialist evaluation
and treatment for cellulitis and ulcer that was routine and
conservative.  [He] saw specialists and the wound healed.  The
coronary artery disease is stable.  [He] is now treating venous
stasis consistently with a pump and compression.  Wound is healed.
This is a durational problem."  (R. 51, 59.)

In November 2014, Dr. Gushue signed a Physical Residual

9

Functional Capacity Questionnaire.[4]  (R. 424-27.)  Chronic
cellulitis in both lower extremities was the diagnosis and fatigue
in legs, edema in legs, and weakness were listed as his symptoms.
(R. 424.)  The prognosis was "stable."  (*Id.*)  It was noted that
Plaintiff had pain in his bilateral lower extremities, the
"clinical findings and objective signs" were noted to be
examination which showed well healed cellulitis scars on both lower
extremities, and Plaintiff's treatment was compression hose,
compression pump, and lower extremity leg braces.  (*Id.*)  The form
indicated that Plaintiff could sit for fifteen minutes at a time,
stand for five minutes at a time, in an eight-hour day he could
sit, stand/walk for a total of less than two hours, he would have
to walk every five minutes for five minutes, he needed a job that
allowed him to shift positions at will, and he would frequently
need to take unscheduled breaks lasting from five to fifteen
minutes.  (R. 425-26.)  It also indicated that Plaintiff's legs
would need to be elevated thirty degrees one hundred percent of the
time if Plaintiff had a sedentary job, he needed leg braces while
occasional standing/walking, and he could never lift and carry any
weight.  (R. 426.)  June 25, 2014, Plaintiff's first visit to the
VA Medical Center, was identified as "the earliest date that the
description of symptoms and limitations in th[e] questionnaire

---

[4]  This is presumably one of the forms Mr. Wilson filled out
to the best of his ability and forwarded to Dr. Gushue for
signature.  (R. 435.)

applies."  (R. 427.)

On November 4, 2014, Dr. Gushue signed a Cardiac Residual Functional Capacity Questionnaire.[5]  (R. 420-23.)  Fatigue in legs, edema in legs and weakness were identified as Plaintiff's symptoms. (R. 420.)  It was indicated that Plaintiff did not have "marked limitations of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary activity, even though . . . comfortable at rest." (*Id.*)  It was determined that his physical symptoms and limitations caused emotional difficulties such as depression or chronic anxiety and the explanation provided was "unable to work due to physical limitations." (R. 421.)  The form indicated that Plaintiff could sit, stand/walk for a total of less than two hours in an eight-hour day, he would frequently need to take unscheduled breaks of unknown duration during which he would need to sit quietly, Plaintiff's legs would need to be elevated thirty degrees one hundred percent of the time if he had a sedentary job, and his impairments were not likely to produce "good days" and "bad days." (R. 422.)

**3.   ALJ Decision**

As noted above, ALJ Riley issued his decision on February 3, 2015. (R. 10-18.)  ALJ Riley made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status

---

[5]   *See supra* n.2.

requirements of the Social Security Act through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since August 22, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: History of Coronary Artery Disease, Lower Extremity Cellulitis, Obesity, and Hearing Loss (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  The claimant requires the ability to alternate sitting and standing at will, provided that he is not off-task more than 10% of the work period.  The claimant is unable to operate foot controls, climb ladders, kneel, or crawl.  The claimant is able to climb stairs occasionally.  The claimant should avoid concentrated exposure to noise and hazards.  The claimant is able to perform work that does not require fine hearing capability.  The claimant requires the ability to elevate his legs 30 degrees during the workday.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 16, 1965 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from August 22, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 12-18.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[6]  It is necessary for the

---

[6]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C.

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the

---

§ 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 17-18.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

15

> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative

16

evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision

17

is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

As noted previously, Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) substantial evidence does not support the ALJ's evaluation of the opinion evidence; 2) substantial evidence does not support the ALJ's RFC assessment; and 3) substantial evidence does not support the ALJ's credibility assessment.  (Doc. 9 at 1-2.)

**A.    *Opinion Evidence Evaluation***

Plaintiff first asserts that substantial evidence does not support the ALJ's evaluation of Dr. Gushue's opinions.  (Doc. 9 at 9-14.)  Defendant maintains the ALJ properly assessed the opinions.  (Doc. 10 at 2-8.)  The assertions on this issue presented in Plaintiff's reply brief are similar to those presented in his

18

supporting brief.  (Doc. 9 at 9-14; Doc. 11 at 1-2.)  I conclude
Plaintiff has not shown that this claimed error is cause for
reversal or remand.

Under applicable regulations and the law of the Third Circuit,
a treating medical source's opinions are generally entitled to
controlling weight, or at least substantial weight.  *See*, *e.g.*,
*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20
C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d
Cir. 1981)).  Sometimes called the "treating physician rule," the
principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely
accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d
Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).
The regulation addresses the weight to be given a treating source's
opinion: "If we find that a treating source's opinion on the
issue(s) of the nature and severity of your impairment(s) is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in your case, we will give it controlling
weight."  20 C.F.R. § 404.1527(c)(2).[7]  "A cardinal principle

---

[7] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225

---

> evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations.'" 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)).  *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized a report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'"   61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

ALJ Riley gave Dr. Gushue's opinions limited weight because the limitations found by Dr. Gushue were inconsistent with the objective medical evidence of record, including her own physical findings.  (R. 16.)  The ALJ specifically pointed to Dr. Gushue's June 25, 2014, finding that Plaintiff "presented with an overall normal physical examination with no swelling of his extremities (Exhibit 9F [R. 428-54])."  (*Id.*)  The ALJ also concluded that the limitations identified in Dr. Gushue's opinions were inconsistent

with Plaintiff's stable cardiac condition as noted by Dr. Chodos. (*Id.* (citing Ex. 1F [R. 259-86]).)

Plaintiff contends that the ALJ erred because he failed to point out any inconsistent medical evidence to support his argument.  (Doc. 9 at 11.)  He adds that medical evidence of record contains numerous clinical findings to support Dr. Gushue's opinion.  (*Id.*)

First, Plaintiff is incorrect that ALJ Riley does not point to any inconsistent evidence: he references Dr. Gushue's own benign June 25, 2014, findings.  (R. 16.)  Significantly, the medical evidence of record shows that this is the only time Plaintiff saw Dr. Gushue prior to the completion of the RFC forms which were filled out by a physician's assistant and signed by Dr. Gushue. (*See* R. 435.)

The evidence to which Plaintiff directs the Court's attention does not support the claimed error in that the evidence shows that Plaintiff did not receive regular treatment for cellulitis that was considered to be consistently problematic enough to prevent him from working for the statutorily required duration.  Plaintiff was treated for lower extremity cellulitis in November 2012 and February 2013.  (R. 334-35, 351-52, 361.)  At the February visit, Plaintiff reported he was overall doing well with only intermittent swelling in his leg, and, although examination showed edema consistent with cellulitis, Dr. Sherpa assessed that Plaintiff was

23

doing well regarding edema.  (R. 361-62.)  After his February visit with Dr. Sherpa, Plaintiff was not seen again until August 6, 2013, at which time Plaintiff reported he was overall doing well and Dr. Sherpa agreed though he noted slight edema and cellulitis in the right lower extremity.  (R. 366-68.)  It was not until August 25, 2013, that Plaintiff had a significant problem with cellulitis for which he was admitted to The Good Samaritan Hospital for intravenous antibiotic treatment with a plan to discharge him when the cellulitis started to resolve and he could be switched to oral antibiotics.  (R. 305-08.)  Plaintiff was discharged on September 3, 2013, with a notation by the discharging physician that Plaintiff should "be off work for another two weeks until he is completed with his antibiotics and the leg feels well enough without any further swelling or complications from this infection." (R. 303.)

In that Plaintiff did not stop working until August 22, 2013, because of his conditions (he worked full-time as an auto technician up until then (R. 181, 182)) and as of September 3, 2013, it was expected that he would be able to return to work within a short period of time (R. 303), to satisfy the statutory duration requirement, 42 U.S.C. § 423(d)(1)(A), Plaintiff must show that his condition worsened to the point that he was unable to engage in substantial gainful activity for the required duration following Dr. Acri's September 3, 2013, return-to-work assessment.

On September 12, 2013, Dr. Sherpa referred Plaintiff to wound care and prescribed Clindamycin when physical examination of the left lower extremity showed that the cellulitis was better but there was a significant wound and some possible abscess with necrossi.  (R. 372.)

On September 18, 2013, Plaintiff was seen at The Good Samaritan Hospital Wound Care Center by Stephen G. Roda, D.O.  (R. 297-98.)  Examination of the skin showed erythema on the lateral aspect of the left leg, the inferior portion of it covered by a large, dark colored eschar, with a proximal one centimeter open area.  (R. 298.)  Some drainage was expressed with palpation, but there was no purulent discharge.  (*Id.*)  Dr. Roda noted some scaling of the skin.  (*Id.*)  He also recorded that Plaintiff and his wife reported that Plaintiff's symptoms were all improved. (*Id.*)  Dr. Roda's Assessment was "[r]esolving cellulitis, status post abscess."  (*Id.*)  On October 7, 2013, physical examination conducted during a cardiac evaluation showed no edema in the extremities.  (R. 277.)  On November 14, 2013, Dr. Roda noted that Plaintiff's wound was well-healed and well-granulated with no periwound erythema and no wound discharge, and full range of motion.  (R. 289.)  On November 15, 2013, Dr. Sherpa noted that Plaintiff was doing much better and was healing.  (R. 374.)  He added that Plaintiff was not able to work due to his constant wound infections.  (*Id.*)  Following these November 2013 visits, the

25

record contains no treatment notes until Plaintiff's June 25, 2014, Lebanon VA Medical Center evaluation at which recurrent cellulitis of the lower extremities was noted by history and physical examination showed no problems, including no edema in the extremities.  (R. 451, 453.)

Plaintiff points to Plaintiff's November 4, 2014, visit to Lebanon VA Medical Center where "the examining physician noted that Derr has chronic stasis ulcerations to the bilateral lower extremity and the he uses support hose and braces for his lower extremities.  (R. 435) The physician observed 1+ pitting edema bilaterally."  (Doc. 9 at 13.)   The record shows that the observations and examination findings were made by Frank Wilson, a physician's assistant, rather than an "examining physician."  (*Id.*; R. 435.)   Plaintiff's recitation does not include Mr. Wilson's report that the chronic stasis ulcerations to the bilateral lower extremity "are well healed at this point."   (*Id.*)

This review of evidence shows that from September 18, 2013, through November 2014, Plaintiff's cellulitis was addressed four times in the medical evidence of record and at no time was it noted to present a current problem of concern beyond the need for measures needed to address edema.  Rather, Plaintiff's August-September 2013 acute cellulitis was considered to be well-healed by wound care specialist Dr. Roda on November 14, 2013, who also recommended that Plaintiff use compression pumps daily and wear

26

compression hose to manage edema.  (R. 289.)  Dr. Roda did not conclude that Plaintiff's condition or the recommended preventive measures rendered Plaintiff unable to work in that he noted that Plaintiff had "a pair of Jobst stockings depending on how he can manage at work."  (R. 289.)

While it may be that Dr. Sherpa correctly noted in November 2013 that Plaintiff had not been able to work due to his constant would infections, his assessment would be supported by the record only for the time period beginning in mid-August 2013 and ending in mid-November 2014 when Dr. Roda assessed Plaintiff to have a well-healed wound and released Plaintiff from his care with recommended preventive measure which included job-related considerations.  The timeline set out above does not support the inference that Dr. Sherpa's notation indicated an inability to engage in substantial gainful activity for the required duration, i.e., for a period that had lasted or was expected to last not less that 12 months.  42 U.S.C. § 423(d)(1)(A).  The record does not contain any evidence of treatment for the edema/cellulitis from November 2013 forward: June and November 2014, records address the diagnosis historically rather than as a condition presenting symptomatically in need of treatment beyond the preventive measures recommended by Dr. Roda.

This review of record evidence shows that Plaintiff has not shown that there are "numerous clinical findings" to support Dr. Gushue's opinions assessing limitations which would render

Plaintiff unable to engage in substantial gainful activity.  (Doc. 9 at 11.)  While Dr. Gushue's cellulitis diagnosis may be supported by clinical findings and the need for ongoing preventive measures are also supported by the record, other than the 1+ pitting edema found on November 4, 2014, the only other clinical finding and objective sign noted was "*well healed* scars."  (R. 424 (emphasis added).)  The degree and duration of limitations found by Dr. Gushue and Mr. Wilson, who each examined Plaintiff only once, are not otherwise supported by the record.

Plaintiff's second criticism of ALJ Riley's determination regarding Dr. Gushue's opinions is that the ALJ should have sought clarification of the basis for the opinions pursuant to SSR 96-5p. (Doc. 9 at 13.)  As argued by Defendant, this assertion is unavailing in that the obligation to contact the Commissioner arises only when the basis of the opinion is not clear but here the ALJ determined that the asserted basis for the opinion was not supported by the record.  (Doc. 10 at 7 (citing 20 C.F.R. §§ 404.1520b, 404.920b; *Moody v. Barnhart*, 114 F. App's 495, 501 (3d Cir. 2004)).)

Finally, Plaintiff's citation to SSR 96-2p and conclusory assertions regarding the weight due Dr. Gushue's opinions presume that the opinion is well-supported.  Plaintiff has not shown this to be the case.  Therefore, Plaintiff's claim that ALJ Riley erred in according the opinions limited weight is not cause for reversal

or remand.

**B.   *Residual Functional Capacity Assessment***

Plaintiff next argues that substantial evidence does not support ALJ Riley's RFC assessment.  (Doc. 9 at 14-17.)  Defendant maintains the RFC assessment accounts for all of Plaintiff's credibly-established limitations.  (Doc. 10 at 8-15.)  I conclude Plaintiff has not shown this claimed error is cause for reversal or remand.

Plaintiff presents five reasons why the RFC is not adequately supported.  (Doc. 9 at 16-17.)  First, he states that because he requires an at-will sit/stand option he would not be able to perform light work which, pursuant to SSR 83-10, would require him to be able to stand and walk, off and on, for a total of six hours in an eight-hour day.  (*Id.* at 16.)  Defendant responds that Plaintiff's premise is wrong in that the regulations provide that a job is in the light category "'when it requires a good deal of walking or standing, *or when it involves sitting most of the time with some pushing and pulling of arm or leg controls*.'"  (Doc. 10 at 9-10 (quoting 20 C.F.R. §§ 404.1567(b), 404.967(b) (emphasis added)).)  Defendant adds that here the VE identified two light jobs and one sedentary job that would allow for sitting most of the time.  (Doc. 10 at 10 (citing R. 38-41).)  In his reply brief, Plaintiff again cites SSR 83-10 and does not address the alternative basis for the light category classification found in

the regulations.  (Doc. 11 at 5.)  The Court finds this disingenuous in that the Social Security Ruling upon which Plaintiff relies also contains the alternative found in the regulations: SSR 83-10 states that "[a] job is also in [the light] category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work."  SSR 83-10, 1983 WL 31251, at *5 (S.S.A.).  Thus, Plaintiff's first argument presents no basis to find the ALJ erred in his RFC assessment.

Second, Plaintiff claims the VE was given insufficient information to find that Plaintiff would be able to perform the jobs of small products assembler, electrical accessories assembler, and table worker because he was not provided specific information as to the frequency and duration of Plaintiff's sit/stand option. (Doc. 9 at 16 (citing SSR 96-9p).)  He further contends that although the ruling applies to the sedentary occupational base, it should also apply to the light occupational base, and the "at will" option in the RFC "provides no basis for making a credible assessment as to the extent to which the occupational base is eroded."  (Doc. 9 at 16-17.)

Defendant responds that Plaintiff's argument should be rejected because the at-will sit/stand option is sufficient to satisfy the requirement of SSR 96-9p and courts have routinely affirmed ALJ decisions involving at at-will sit/stand option in

cases involving light exertional work.  (Doc. 10 at 10-12 (citing *Bryant v. Colvin*, No. 4:14-CV-981, 2015 WL 1401001, at *11 (M.D. Pa. Mar. 26, 2015)*; Robbins v. Colvin*, No. 3:12-CV-01999, 2014 WL 794592 (M.D. Pa. Feb. 27, 2014); *Fallon v. SSA Comm'r*, No. 1:10-cv-00058-JAW, 2011 WL 167039, at *3 (D. Me. Jan. 4, 2011); *Cruz v. Astrue*, Civ. A. No. 09-0508, 2010 WL 3809829, at *8-9 (E.D. Pa. Sept. 28, 2010)).)  Defendant notes that here ALJ Riley went beyond the basic at-will option by adding that the option could not cause him to be off-task more than ten percent of the work period.  (Doc. 10 at 11.)

In his reply brief, Plaintiff does not refute the authority relied upon by Defendant or the propositions for which the cases are cited; rather, Plaintiff states Defendant failed to note that the ALJ did not give the VE information regarding the frequency and duration of Plaintiff's sit/stand option.  (Doc. 11 at 5-6.)  In that ALJ Riley included in his hypothetical a "sit, stand option defined as allowing a person to sit or stand alternatively at will provided this person is not off task more than 10 percent of the work period" (R. 38-39), Plaintiff is mistaken on two counts: the ALJ provided legally adequate information to the VE and Defendant appropriately noted the same.

Plaintiff's remaining three bases of error are merely one-sentence conclusory assertions which do not warrant discussion and do not satisfy his burden of showing the ALJ erred in his RFC

31

assessment.  (*See* Doc. 9 at 17.)

Finally, I consider Plaintiff's reference to obesity in the credibility section of his brief.  (Doc. 9 at 21.)  In the context of his claimed credibility error, Plaintiff asserts that the ALJ failed to account for his obesity in the RFC.  (*Id.*)  Defendant notes that "Plaintiff has not presented any limitations caused by his obesity that call for more limiting restrictions than those captured by the ALJ in his RFC finding."  (Doc. 14 at 20 (citing Doc. 9 at 21).)  Defendant correctly concludes there was no error here in that, under Third Circuit law, "where a claimant does 'not specify how his [or her] obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk,' there is no basis for remand."  (Doc. 10 at 14-15 (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).)

## C.   *Credibility*

Plaintiff's final claimed error is that substantial evidence does not support the ALJ's credibility assessment.  (Doc. 9 at 17-21.)  Defendant responds that substantial evidence supports the ALJ's credibility determination.  (Doc 10 at 15-18.)  In his reply brief, Plaintiff reiterates his initial arguments.  (Doc. 11 at 6-8.)  I conclude Plaintiff has not shown that this claimed error is cause for reversal or remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he

32

or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Comm'r of Soc. Sec.*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

ALJ Riley provided a detailed explanation to support his determination that Plaintiff's allegations regarding the limiting

effects of his alleged conditions were not fully credible.  (R. 16.)

> The medical evidence of record does not support the claimant's allegations.  While the claimant has a history of coronary artery disease, Dr. Chodos noted that the claimant is asymptomatic with no symptoms suggestive of angina (Exhibit 1F [R. 259-86]).  The record indicates that the claimant's left leg cellulitis/abscess was found to be well-healed and well-granulated with no periwound erythema or discharge, as noted by Dr. Rhoda.  Dr. Rhoda also found that the claimant presented with full range of motion of his extremity without discomfort.  Dr. Rhoda also noted that the claimant no longer required an antibiotic regimen (Exhibit 2F [R. 287-343]).  The record indicates the claimant's recommended conservative treatment for his alleged leg swelling is effective.  On June 24, 2014, Dr. Gushue found that the claimant presented without swelling of his extremities.  In November 2014, Mr. Wilson found that the claimant presented with only 1+ pitting edema of the legs, which indicates a barely detectable impression with pressure to the skin (Exhibit 9F [R. 428-54]).  The record indicates that the claimant's audiogram showed hearing loss in both ears with poor speech understanding on the right but excellent speech understanding on the left (Exhibit 9F [R. 428-54]).  The claimant's own reported activities of daily living are also inconsistent with his allegations.  The claimant is able to meet his personal care needs, cook, perform household chores, such as washing dishes and taking out the trash, and drive (Hearing testimony [R. 23-45] and Exhibit 5E [R. 201-14]).

(R. 16.)

Plaintiff asserts that ALJ Riley rejected his credibility without adequate rationale and it is "completely undercut by his

34

mischaracterization of the medical evidence of record." (Doc. 9 at 18.) He first criticizes the ALJ's reference to the effectiveness of conservative treatment, stating that the reasoning does not "automatically indicate" that Plaintiff's leg swelling is not disabling. (*Id.*) In support of his assertion, Plaintiff points to *Shaw v. Apfel*, 221 F.3d 126 (2d Cir. 2000), where the court concluded the ALJ had improperly characterized the claimant's recommended conservative treatment as support for the finding the claimant was disabled. (Doc. 9 at 18.) "'Essentially, the ALJ and trial court imposed their notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered. This is not the overwhelming compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion.'" (*Id.* (quoting *Shaw*, 221 F.3d at 134-35).)

First, this case is easily distinguishable from *Shaw* where the circuit court found the opinion of the treating physician, who had treated the plaintiff regularly for seven years and had made far more extensive medical observations than those of any consulting physician, was entitled to controlling or great weight. 221 F.3d at 134. Where *Shaw* concluded an "otherwise valid medical opinion" could not be undermined on the basis of the conservative nature of treatment rendered, here the reliability of the opinion of the treating physician who had examined Plaintiff on one occasion and

35

made no findings of active problems (R. 451-54) is not entitled to the same deference.  Further, our circuit has concluded that a finding that a claimant received only conservative treatment is an appropriate consideration in assessing credibility regarding disabling symptoms.  *See Garrett v. Commissioner of Social Security*, 274 F. App'x 159, 164 (3d Cir. 2008) (not precedential).

Plaintiff next posits that the ALJ wrongly assessed his activities of daily living--his ability to do household chores does not demonstrate that he could perform in a full-time position. (Doc. 9 at 19-20.)  Here Plaintiff's reported activities go beyond doing household chores.  Plaintiff reported that he goes camping, shops regularly, and he drives 500 to 1000 miles per month.  (R. 204, 205, 254.)  Insofar as activities of daily living are properly considered in determining credibility,  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), and ALJ Riley cited *many* bases for his finding that Plaintiff was not fully credible (R. 16), Plaintiff has not shown that the ALJ erred on the basis alleged.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 1, 2016